**BOWLES, Price Administrator, v. MILLER et al.**

District Court, S. D. New York.

Feb. 16, 1946.

John D. Masterton, Chief Enforcement Atty., O.P.A., of New York City, (Max Berger, Enforcement Attorney, Paul L. Ross, Regional Enforcement Executive, Region II, and Elliott L. Biskind, Chief General Litigation Branch, Litigation Section, all of O.P.A., all of New York City, on the brief), for plaintiff.

Cohen & Wedeen, of New York City, (Nathan B. Fogelson, of New York City, of counsel), for defendant.

BRIGHT, District Judge.

Plaintiff originally brought this action to restrain defendants from selling interlining flannels in excess of the maximum prices established by the General Maximum Price Regulation (referred to in the papers and throughout the trial as GMPR), alleging that between May 5, 1943, and March 27, 1944, defendants did so sell, and also asked for treble damages.

By stipulation dated May 8, 1944, it was agreed that the only issue in dispute is whether the sales were covered by that regulation or by Maximum Price Regulation No. 127; if the latter, the complaint is to be dismissed without costs and disbursements, and if the former, judgment is to go against the defendants in the sum of $15,371.19, which is the aggregate amount by which the consideration in the transactions referred to in the complaint exceeds the maximum prices provided for by GMPR.

A second stipulation was entered into in October 1944, but which does not change the question to be decided. It recites the previous stipulation, and in order to carry out its intent and purpose, it is agreed that defendants have been engaged in business for thirty years, at the present time are doing an annual business of about $1,000,-000, confined to the sale of interlining flannels. One of its largest suppliers of which for twenty-five years has been the Edwards Manufacturing Company. It is further agreed that the prices following are the legal prices in cents per yard, for which defendants may sell after March 1943, depending upon the regulation which the court finds controls:

| Item | GMPR | No. 127 |
|---|---|---|
| Supreme #175 | 32½ | .3656 |
| Alpha #200 | 28½ | .31353 |
| Ivanhoe #225 | 24½ | .2725 |
| Imperial #250 | 25 | |
| Monarch #275 | 22½ | .2266 |
| Rainbow #300 | 20 | .2116 |

It further appears from the stipulation that in March 1943, Edwards declined any longer to sell, deliver and invoice goods in the finished state (that is, as interlining

flannels), but offered to invoice piece goods in the greige (pronounced "gray") state, unfinished (in which condition they were known as soft-filled sheeting), and did invoice the price for finishing such goods in a separate invoice. Subsequent to March 1943, in all transactions between the defendants and Edwards, merchandise was invoiced in the greige state, but the greige goods were thereafter processed to the finished state by Edwards. All the goods, however, were delivered by Edwards to defendants in the finished state.

It is shown without dispute that the type and quality of finish applied were identical before and after March 1943, and in no case, before or after March 1943, did the defendants receive from Edwards goods other than in the finished state as they had for some time before March, 1943.

Both sides introduced additional evidence, but it was not of such a character to change materially the facts as stipulated as above. Soft-filled sheeting, which is the greige state of the commodity in question, is processed by a single or double napping, and when so processed, is delivered to defendants as interlining flannel and sold by them to the cut-up trade, which consists of manufacturers of children's and infants' wear and ladies' long coats.

GMPR provides that after its effective date (May 11, 1942) no person shall sell or deliver, or buy or receive, any commodity or service at a price higher than the maximum price permitted by that regulation, which shall be, so far as this case is concerned, the highest price charged by the seller during March 1942.

When this regulation became effective, defendants were jobbers in the sale of interlining flannels, and have since continued the same business to date, that is, selling to their customers finished or napped interlining. In March 1942, they bought napped or finished interlining from Edwards, and up to the time of the trial, the product in almost every instance actually delivered to the defendants here in New York has been the finished interlining.

From the effective date of GMPR until March 1943, defendants purchased the finished interlining from Edwards and sold the same as a jobber in accordance with and at not to exceed the ceiling prices specified in, that regulation. In that month, defendant claims they requested Edwards to sell them interlining flannels, and Edwards suggested that defendants buy greige soft-filled sheeting and then have Edwards nap it and bill them twice, once for the sheeting when ordered and later for the napping or processing when done at the request of the defendants. At that time, so it is said, Edwards stated they could only sell greige goods to the defendant, who could take the greige goods and have them napped or processed at any place they wished, or could have them finished at the Edwards plant. They did not explain why they were not in the position to sell defendants the finished lining.

It is undisputed that prior to March 1943, when Edwards commenced billing for greige soft-filled sheeting and separately for napping that sheeting, defendants were selling interlining flannels under GMPR as a jobber. They claim that after such billing, they began to sell under Regulation No. 127. Defendants arrived at the selling price under Regulation No. 127 by adding together the cost of the greige goods, the cost of finishing, the cost of packing and the freight from the finishing plant to the defendants, dividing the total by a divisional factor of 88, which gave defendants a 12% mark up, which, when added to the other total, is the defendant's selling price, which they claim as converters as they were finishing the greige goods previously purchased from Edwards.

It appears that in April 1934 and February 1935, soft-filled sheeting purchased by defendants from Edwards had been napped at the Lewiston bleachery, and in September and October 1935, by Edwards and billed separately. The reason for that was not explained. From March 1943 to September 11, 1944, Edwards had sold greige soft-filled sheeting to defendants, and had then napped or processed it, billing the sheeting and the processing separately. Nearly all of the letters between the defendants and Edwards during that period state that such practice will be followed "in keeping with our mutual arrangement." With but one exception, as I remember, it

was stated that the greige goods would be processed by the Edwards Finishing Department, and would be shipped to defendant as soon as the Edwards mill had processed the greige goods. The exception mentioned is that in a letter dated June 9, 1944, defendants referred to the goods as "cotton interlining".

It further appeared that Edwards for more than fifteen years has been manufacturing soft-filled sheeting and processing it into interlining flannels. During all of that time, and up to the present, it maintained and operated a mill for finishing and also sold and still sells job finishing service. They did not do finishing for the defendants in 1942, but did for others. In 1943, Edwards instructed its selling agents to offer to defendants soft-filled sheeting, which was done, and since then Edwards or its agents have not offered interlining flannels either to the defendant or to the government. Goods are now job finished by Edwards for defendants and others.

 It is clear to me that the attempted change in the regulations between the defendants and Edwards in March 1943 was mutually agreed upon merely to circumvent the GMPR to the profit both of Edwards as well as of the defendants. There is no explanation why the change was made, no reason given why after some twenty-five years of billing it should suddenly occur to either or both of them that first the greige goods should be billed and paid for and then they should be processed, where bought, and a separate bill rendered for that processing. Everything except the billing went on as before, and there never was anything delivered except the finished goods, as had always been the case.

Such an obvious evasion of the provisions of the General Maximum Price Regulation cannot be permitted. The defendants must be held to the practice which they adopted when GMPR became effective, and to the maximum price then established. They cannot be permitted by such a simple device, of having two bills grow where one grew before, to evade a clear maximum price limitation in GMPR, to which they conformed for almost a year.

In respect to this particular commodity, and under the facts here shown, they are jobbers and not converters.

 It would seem unnecessary under the stipulation to proceed further. However, I cannot see how, in any event, it can be claimed that the prices to be charged by the defendants are governed by Regulation No. 127. Section 1400.78(32) of that regulation expressly stipulates that the provisions of Regulation 127 shall not apply to "Any fabric covered by Maximum Price Regulation No. 118—Cotton Products." If defendants are now jobbers in the sale of interlining flannels, they undoubtedly come under GMPR. Maximum Price Regulation 118 relates to cotton products such as the merchandise in question. It expressly refers, in its definition of Cotton Products, to interlining flannels and soft-filled fabrics, § 1400.115(5) (iii); in § 1400.118, containing the formula for maximum prices on certain cotton products, to interlining flannel, subd.(d) (2) (vi); and in § 1400.118(d) (3) to gray soft-filled sheeting and to premiums which may be had for napping. It is true § 1400.104(a) provides that Regulation 118 is not applicable to "sales and deliveries of cotton products in the performance of a recognized distributive function by any wholesaler, jobber or retailer" not controlled by the producer. But that section is limited by its foot note by the statement that, "No sale is made in the performance of a recognized distributive function, within the meaning of this Maximum Price Regulation No. 118 unless it advances the goods sold to the next stage of distribution." Here, the goods were not advanced by the defendants to the next stage of distribution. They clearly bought interlining flannels and sold them. The advance from soft-filled sheeting to interlining flannels was made, as it always had been made, by Edwards.

If defendant, by the change in practice of billing now urged can be said to have lost his status as a jobber and now to be a converter by reason of the fact that he became the owner of soft-filled sheeting, and then had it changed or processed into interlining flannel at an additional expense,

he still is controlled by § 1400.118(d) (3) and not by Regulation 127.

This interpretation of the several regulations seems to be verified by the interpretation of the Price Administrator on February 9, 1943 (O.P.A. Service Volume 3 at page 15.517)—

"(1) Where the sale of the commodity and the sale of the 'service' to be rendered on the commodity are in any manner tied together, the entire transaction is regarded as a sale of the commodity as serviced (i. e., as repaired or processed), and the total of the charges for the unserviced commodity and the servicing may not exceed the maximum price for a sale by the particular seller of the serviced commodity. The sale of the commodity and the sale of the servicing are always tied together if the servicing is done before the commodity is delivered."

In conformity with the stipulation of May 8, 1944, I direct judgment in favor of the plaintiff for the sum of $15,371.19.